SAMUEL K. SCHWENK, Appellant, *v.* ROBERT NAYLOR, Respondent.

*Court of Appeals, June* 1, 1886.

Reversing 50 N. Y. Super. 57.

1. *False representations. Sale of stock*—A false and fraudulent representation, as to the property of a corporation, of material facts which necessarily affect the value of shares of stock therein, constitutes a cause of action against a party inducing another, by means of such fraudulent misrepresentation, to purchase such shares, quite as sufficient as if the purchase had been of the property of the company with regard to which the representation was made; nor is it material in either case, that the purchase price of the property, or the money advanced on the faith of the representation, be paid to the party making it, for his individual benefit.

2. *Same. Examination of property.*—The vendee in such case, though present to examine the property, has a right to rely upon the representations of the vendor as to the extent and boundary of the property, and is not bound to examine the title when the vendor professes to know all about it and the extent of the property, especially when he cannot ascertain a knowledge of these matters by an examination.

3. *Same.*—The court of appeals refused to hold that a disputed and doubtful equitable title is equivalent to a clear and undisputed legal title, and that no damage can be sustained by the substitution of the former, for the latter, title by means of a fraud.

This action was brought to recover damages claimed to have been sustained by plaintiffs by reason of fraudulent representations made to them by defendant by means whereof plaintiffs were induced to purchase from him two-thirds of a mill property in Florida, or of the capital stock of a corporation, to which said property had been conveyed by defendant.

Appeal from a judgment of the general term of the New York superior court, affirming judgment for defendant,

that the complaint be dismissed, entered upon the direction of the trial judge.

*A. R. Dyett* and *Joseph Fettretch,* for appellants.

*Wm. B. Putney,* for respondent.

RAPALLO, J.—This action was brought to recover damages claimed to have been sustained by the plaintiffs by reason of fraudulent representations made to them by the defendant in November 1880, whereby the plaintiffs were induced to purchase from him two-thirds of a mill property in Florida, or of the capital stock of an incorporated saw-mill and lumber company organized under the laws of this state, to which said property had been conveyed by defendant, and to furnish the sum of $15,000 for operating the mill and business of the company.

The representations alleged in the complaint were that the defendant was the holder or owner of all the · capital stock of said company, and that the company owned and had title to about thirty-five acres of land situated at Apalachicola, Florida, having thereon a large and valuable sawmill, with its machinery, etc., and also having an extensive water front of over 2,000 feet on Turtle harbor, with large and commodious wharves, all of which property was of the value of $125,000, and that the said mill was and could be made very profitable, and would yield a profit of $100,000 a year; that the lands of said company included, as a part thereof, and of said water front, the whole of a dock extending in length 250 feet, or thereabouts, in a southwesterly direction along the shore of Turtle harbor, and a tramway leading from the mill to the dock, and the land upon which said · dock and tramway were situated, and all the land adjoining, extending, in a southwesterly direction from the mill, to a certain ditch or creek which the defendant showed to the plaintiff, Kilpatrick, and represented to him was the

boundary line of the city of Apalachicola, and were part of and used in connection with said mill.

The complaint further alleged that the whole of said dock and tramway, so represented by the defendant to be included in the lands of said company, were material and necessary to the mill, and the operation thereof, and that without the same the mill could not be successfully and profitably operated; that, believing and relying upon said representations, the plaintiffs were induced by the defendant to enter into an agreement with him to take and purchase two-thirds of the capital stock, and to provide and furnish the sum of $15,000 to operate the mill, and did also, at the request of the defendant, furnish and advance further sums, which the defendant represented to be necessary for the operation of said mill and business; and that such advances were induced by the representations alleged to be false and fraudulent. The representations were alleged to be false in this: that the lands of said corporation did not, as the defendant then well knew, include the whole of said dock and tramway, nor the whole of the land on which they were situated, nor any of said dock, tramway, or land, except a small and inconsiderable part thereof, nor did the land of the company, as the defendant then well knew, include all the land which the defendant represented that the same did include, nor was the ditch or creek, before mentioned, the boundary line of the city of Apalachicola, and that said false representations were fraudulently made, with intent to deceive and defraud the plaintiffs.

The complaint further alleged that, as part of the agreement, the defendant took charge of the mill and business at Florida, and the plaintiffs paid out, for the purpose of said business, in addition to the $15,000 first mentioned, the further sum of $20,000 on the faith of said false representations; that said mill and property, without the whole of said dock, tramway and land, were worth $35,000 less than they would have been worth had the representations

been true, and they would not have entered into the agreement, or furnished any of the money, or purchased the stock, if they had known that the representations were false, and they claim damages to the amount of $35,000.

The answer admitted the making of the agreement, alleged in the complaint; and stated that, at the time it was made, the defendant owned or controlled all the capital stock of the company, but denied the false representations, charged, and set up other matters of defense.

On the trial, the plaintiff Kilpatrick was called as a witness on his own behalf, and produced a written agreement between himself and his co-plaintiff, Schwenk, of the one part and the defendant of the other part, dated November 11, 1880, whereby the defendant agreed to sell to the plaintiffs, and they agreed to purchase, one undivided third interest each, of and in the mill and machinery therein, unfinished tug, real estate, and all other property at Apalachicola, Florida, belonging to said Naylor, on the following terms, viz.: That the plaintiffs should provide and furnish $15,000, as required for working the mill and business effectually; that all profits of the business for three years should belong to Naylor, in payment for said two-thirds interests, except $55,000, which should be paid to the plaintiffs out of two-thirds share of profits; that a company having been already incorporated under the laws of the state of New York for the purchase and working of the mills, the sole control of which was then in the hands of the defendant, the capital stock of said company should be divided equally between all the parties to the agreement, immediately upon said working capital being furnished; that the defendant having furnished a list of the property and machinery at Apalachicola, which list was attached to the agreement, the only condition of the contract was that all the property stated in said list should be found there when the plaintiffs, or one of them, should visit the mill, and, if not so found, they should be free to withdraw from

the agreement should they so determine; that one of them should visit the mill within thirty days, or the condition should be deemed waived, and the property be considered finally accepted by them. The agreement contains other provisions not important to the present inquiry. Attached to the agreement was a list entitled, "Machinery in saw-mills and premises at Apalachicola, Florida, belonging to R. Naylor." Then follows a minute inventory, covering several pages, of the various articles of machinery, but the only reference to the real estate was: "These saw-mills have an extensive water front of some 2,000 feet immediately on Turtle harbor, with wharf, etc." "The site comprises about thirty acres." The log pond will store 10,000,000 feet of logs." "The buildings comprise large saw-mill, 50 by 150 feet; two stories." Engine and boiler houses, 40 by 60 feet."

The plaintiff Kilpatrick testified that the defendant made representations to him at the time the agreement was made; that the defendant stated to him the condition of the mill, the formation of the company, the necessity of capital to complete the machinery, and its worthlessness in its then present condition, but its capacity of being made very profitable with a small outlay of money; and the witness proceeded to set forth the negotiation which ensued. The witness testified that the defendant stated that the water front embraced docks from 500 to 600 feet long; that the water front attached to the mill, and available for its use, was at least 2,000 feet, and that already a dock had been built, 500 or 600 feet long, on the portion of the water front adjoining the mill; that after the agreement had been executed, the witness went down to the mill, where the defendant had preceded him; that he found the mill there, and the heavy machinery, and the defendant took him down to the dock and pointed out what he said was the water front, and the line between the town of Apalachicola and the mill property, which ran to the line of the town; that he pointed out a

little creek, from 800 to 850 feet south of the mill, and besides that, in the distance, a little bay or ditch, that formed the line between the town of Apalachicola and the mill property; that the witness was accustomed to measure distances with his eye, and he should judge that from the end of the dock to that line was about 800 feet, and they agreed that, if they had so much land on that side of the mill, it was abundant room for all practical purposes; that when the defendant made these representations to the witness in regard to the wharf and the lines of the city of Apalachicola, he (witness) believed them, and did not doubt them for a moment, and then returned to New York, having authorized the defendant to draw upon him for the required funds; that this wharf and the tramway, which ran the whole length of the wharf, were indispensably necessary for the operation of the mill; that to the north of it was all swamp land.

From the testimony of this witness it appears that the wharf, as then standing, was about 250 feet long, part of it having been previously carried away; that the line pointed out to him by the defendant as the line between the mill property and the city of Apalachicola was about 800 feet south of the south end of the wharf. and about 1,000 feet south of the mill, but that, as he afterwards ascertained, the line between the mill property and the city was in fact only about thirty feet south of the mill, and that there was left belonging to the mill property and to the company in fact only about thirty feet of wharf and water front south of the mill, instead of 1,000 feet of water front and 250 feet of wharf, while at least 800 feet of wharf was necessary to run the mill, and could not be obtained on the north side of the mill at a cost of less than $50,000, owing to the location and character of the property.

The witness further testified that in January, 1882, the defendant being then in New York, the witness had a conversation with him, in which witness said to him: "Mr. Naylor, I have learned that the property embracing the docks and tram-

ways has been purchased by you, and taken in your name
and that you personally have not conveyed the property to
the mill company, but that you have sold it; " and that the
defendant replied: " I will never convey it in the world.
You can't make me. I have conveyed it to another party
for fear of your getting it; " and witness thereupon called
upon other persons who were present to take note of what
the defendant said, and violent language then passed be-
tween plaintiff and the defendant. The witness further
stated that he did not discover, until after October, 1881, that
the wharf did not belong to the company, and after he had
made large advances in addition to the $15,000.

The plaintiff Schwenck corroborated the testimony of
Kilpatrick. Schwenck testified that when the agreement of
November 11, 1880, was made, the defendant represented
that the property consisted of thirty-three to thirty-five
acres, with a river front of about 2,000 feet, and extensive
wharves to be used in the shipment of lumber; that the
witness was present at the conversation in January, 1882,
testified to by Kilpatrick; that Kilpatrick told the defend-
ant that he had discovered that the lots which he had sold
to plaintiffs, as a part of the wharf property belonging to
the mill, had not belonged to defendant at the time he sold
them to plaintiffs, and that afterwards he (defendant) had
bought them in his own name, and so held them; and Kil-
patrick said, " Mr. Naylor, you know you cannot do that; "
and Naylor replied, " I have taken counsel in the matter,
and I can do it; " and Kilpatrick said, " You will have to
convey that to us ; " and Naylor said he would not do it and
Kilpatrick replied, " You will have to either do it or we will
put you behind the bars ; " that some other strong expres-
sions were used, and Mr. Naylor said, " I will make you pay
$50,000 for those lots. I have already conveyed them to
some one else to prevent your getting them." On the cross-
examination of Schwenck, the defendant put in evidence a
contract dated January 18, 1882, between the defendant

and Schwenck, whereby the defendant agreed to sell to Schwenck, for $15,000, one-third of the capital stock of the Central Florida Mill and Lumber Company, and to convey, or cause to be conveyed, to him, the real estate recently purchased by the defendant, and owned or controlled by him, contiguous to the land and improvements of the company, including that forming the wharf frontage, and furnishing the right of way for passing in and out, loading and unloading vessels, and Schwenck agreed to pay to Naylor any sum found due him for salary, or for money expended by him in carrying out the business of said company.

The plaintiff Kilpatrick testified that he never saw or knew or heard of this agreement before it was produced in court, and the plaintiff Schwenck testified that the agreement was never carried out.

Edward W. Kilpatrick, a son of the plaintiff, who was also present at the conversation in January, 1882, testified to by the plaintiffs, corroborated their testimony in that respect, and stated that in that conversation the plaintiff, Kilpatrick, said, " Mr. Naylor, do you know that there is a portion of this land which you represented as belonging to the property that did not belong to it ?" and Naylor answered, " Yes ;" and then followed the demand and refusal of a conveyance of that property, and the declaration of Naylor that he would make plaintiffs pay $50,000 for it if necessary.

Charles H. Storking, another witness for the plaintiffs, who had gone to the property, stated, from declarations made to him in December, 1881, while in Florida, by Naylor, with a map then before them, that the property which Naylor claimed to own individually took away from the mill property all but about fifty feet of the wharf. The deed to Naylor of this property was put in evidence, and bore date September 8, 1881.

The foregoing, together with the deed from Naylor to

the company, dated January 15, 1880, constituted the substance of all the evidence, and at the close of the testimony the defendant moved to dismiss the complaint, but no ground for such dismissal is stated in the case.

The judge presiding at the trial granted the motion, assigning as reasons that the representations were not made concerning the stock, but concerning the length of the water front and the size of the dock; that upon these representations the plaintiffs parted with their money, not to the defendant for his individual benefit, but to him to be used in the improvement of the company's property, and the money was so used; that it was not proved that all the representations were untrue, and therefore the only remedy the plaintiffs had was to rescind, and recover back their money on a tender back of the stock; that they could not sue in affirmance of the contract and for partial damages, because it was necessary, in such a case, as in the case of a warranty, that the false or fraudulent representations should have been made concerning the article for the inferiority of which the recovery is sought; that the sale in this case was of the stock, and, as the representations were not made concerning the stock, there was no cause of action for false and fraudulent representations; that as to the length of the dock the plaintiffs could see for themselves before they parted with any money, and need not have been misled, and as to the deficiency in the water front the evidence was insufficient to establish the fraudulent character of the representations at the time they were made, as the parties might well have been mistaken as to the boundaries.

We think that, although the interests purchased by the plaintiffs were conveyed to them by means of a transfer of the stock, the contract was in substance for a sale of two-thirds interest in the property; the defendant representing himself as holding the entire interest, in the form of stock. The contract of sales states in terms that the defendant

agrees to sell, and the plaintiffs agree to purchase, one undivided, third interest each, in "all that mill, and machinery therein, unfinished tug, real estate, and all other property at Apalachicola, Franklin county, Florida, belonging to said Naylor, on the following terms." A list of the property was furnished and attached to the contract, and one of the conditions was that the property in the list should be found at the mill. The contract recited that this property was represented by stock in the company, which had been formed for the purpose of operating the mill, the sole control of which was in the hands of Naylor, and that the stock of that company was to be equally divided between the three parties. That mode of transferring the interests sold, did not, however, change the substance of the transaction, which was a sale of two-thirds interest in the property described.

It is quite immaterial, however, whether the sale was of the property or of the stock. A false and fraudulent representation, as to the property of a corporation, of material facts which necessarily affect the value of shares of stock therein, constitutes a cause of action against a party inducing another, by means of such fraudulent misrepresentation, to purchase such shares, quite as sufficient as if the purchase had been of the property of the company with regard to which the representation was made; nor is it material, in either case, that the purchase price of the property, or the money advanced on the faith of the representation, be paid to the party making it, for his individual benefit. If known to be false, and made with intent to deceive and defraud the person who is thereby induced to pay out his money, the person guilty of the fraud is liable to respond in damages, on the same principle on which one person is held liable in damages for fraudulently giving a false recommendation by which another is induced to give credit to a third party.

In the present case, however, the money advanced by the

plaintiff was proved to have been paid to the defendant, and there is no evidence showing what disposition he made of it; but, even if he did expend it in the improvement of the company's property, he reaped an individual benefit, to the extent of at least one third of it, as he was the owner of one-third of the stock of the company, and, according to his own statements, the effect of the advance was expected to be, to make his stock, which without the improvements, was worthless, yield a large profit, and he had a strong personal interest in inducing the plaintiffs to make the advance.

The next ground of nonsuit, as to the dock, cannot be sustained. The plaintiff Kilpatrick saw the dock, but it is not correct to say that he could not be misled. According to his testimony he was misled. What he saw was a long dock running southerly from the mill, with a tramway extending its entire length. To the extent of about 250 feet it was in good repair, but beyond that a part had been carried away, leaving piles still standing, and beyond the 250 feet the defendant pointed out to him a water front of about 800 feet which he represented to belong to the mill property, and to be on the mill side of the city line, while, according to the defendant's own admission to the witness Storking, only about 50 feet of this wharf and water front belonged to the company, and the rest was claimed by the defendant to belong to him by virtue of a purchase made by him subsequent to the sale to the plaintiffs, and for this property he declared to the plaintiffs, in 1882, that he would compel them to pay $50,000 and stated to them that he had conveyed it to another party to prevent them getting it.

The representation on which the property was sold was well calculated to mislead, as the 250 feet of wharf was still standing, and the residue of the water front pointed out was marked by physical objects, while, as testified to by Kilpatrick, there was nothing on the land to indicate the city line, and if he had examined the deed from the plaintiff to the company, put in evidence, he could not have discovered

from its description anything except that the property was
bounded on the south by the city line, of the location of
which he knew nothing except what was represented by the
defendant, the description in the deed being by section
numbers.  Kilpatrick was only two days at Apalachicola,
and could not be presumed to know the location of the city
line.  He suggested to the defendant, at that time, that he
would like to employ a lawyer to examine the records, but
the defendant said that he had all the papers straight, and
it was all right, and he had a perfect title ; that he had paid
his money, and knew what the property was.  Under these
circumstances, we are of opinion that the plaintiff had the
right to rely upon the representation of the defendant as to
the extent and boundary of the property.  All that, by the
terms of the contract, he had undertaken to do was to see
that the property was there as represented.  He saw it be-
fore him, but was not bound then and there to examine the
titles, especially when the defendant professed to know all
about it and the extent of the property.  Whitney v. Allaire,
4 Denio, 555 ; Allaire v. Whitney, 1 Hill, 485 ; Beardsley v.
Duntley, 69 N. Y. 577.

The last ground of nonsuit was that, as to the deficiency
in the water front, the evidence was insufficient to establish
the fraudulent character of the representations at the time
they were made, that the difficulty arose from the boundary
line, and as to that the parties might well be mistaken.  We
think that, under the evidence, this was eminently a ques-
tion for the jury.  The evidence of the statement of the de-
fendant (which the jury might infer was made for the pur-
pose of deterring Kilpatrick from employing a lawyer) that
he had the papers all straight, and had a perfect title, and
had paid his money, and knew what the property was, was
pertinent to this point ; and, coupled with the facts that
when, in September, 1881, the property deficient was put
up for sale in Florida under the decree of the probate court,
he knew enough to buy it ; and his admission, testified to

by Edward W. Kilpatrick, that he knew that there was a portion of the land which he represented to the plaintiffs as belonging to the property that did not belong to it, without any qualifications as to the time when he had such knowledge ; his taking the trouble to consult a lawyer when he bought the deficient property as to whether he could hold it against the company, and his resorting to the plan of conveying it away to prevent the company getting it; and his threat to compel the plaintiff to pay $50,000 for it—these circumstances, unexplained as they are in the case as now presented to us, tend to show bad faith on the part of the defendant, and to make out a strong chain of evidence for submission to the jury on the questions of guilty knowledge and fraudulent intent.

At general term a new and different ground, not assumed by the judge at the trial, was taken for affirming his conclusion. The principal point not already answered was that the plaintiffs had not shown any damage from the false representations ; that there was no proof, and the description in the deed from Naylor to the company, unexplained, did not show that the land in dispute was not contained in the deed ; that the company was in possession of the land in dispute (which fact was not clearly shown); that there was no substantial testimony that the company did not own the 2,000 feet of water front and the wharf as represented, except the fact that the subsequent purchase by Naylor. These points are sufficiently answered by the testimony of Storking and the admissions of Naylor.

But the main ground taken by the court is that, by the implied warranty in the agreement of purchase of November 11, 1880, and the express warranty in the deed from Naylor to the company, the company became, by estoppel, the owner of the equitable title to the land in dispute, and that the consideration of the last conveyances to Naylor having been paid with the money of the company, or of the plaintiffs (a fact of which there was no proof), made him

10

the trustee for the one whose money was paid; that, although he had admitted that he had conveyed away the property, there could be no *bona fide* purchase from him, because the possession of the company was notice of its rights, and the purchaser would take subject to that notice. This seems to us a rather strained argument by which to sustain what, upon the case as presented, in the absence of any explanation, the jury might have pronounced a gross fraud. In the first place, the evidence as to possession by the company of the disputed premises is very indefinite. It does not show what, if any, business was carried on at the mill, or to what extent the company were in possession of or occupied the water front. But whatever possession there was, was through Naylor, who did not leave the property till December, 1881, which was after his purchase of the water front. Up to that time he was the apparent possessor of the property; and there is nothing to show that the rights of the company, or that he was its representative, was generally or at all known in Apalachicola. The company was a private corporation, organized in New York, and it is, to say the least, very doubtful whether, under the circumstances, the possession of Naylor would be notice to the world of any rights but his own, and whether there could not have been a *bona fide* purchase from him. To hold that a disputed and doubtful equitable title, such as is suggested in the opinion of the general term, is equivalent to a clear and undisputed legal title, and that no damage could be sustained by the substitution of the one for the other by means of a fraud, is going further than we are inclined to follow.

The judgment should be reversed, and a new trial ordered, costs to abide the event.

All concur.